HANNAH M. KENYON, Administratrix, Appellant, v. ILLINOIS CENTRAL RAILROAD COMPANY, Appellee.

**MASTER AND SERVANT:** Tools, Machinery and Appliances—Negligence—Evidence—Sufficiency. Evidence reviewed, and held sufficient to carry to the jury the question of the master's negligence in the maintenance of a water pipe or penstock.

**NEGLIGENCE:** Contributory Negligence—Federal Employers' Liability Act. Contributory negligence on the part of an injured servant will not necessarily defeat a recovery under the Federal Employers' Liability Act. (Act Apr. 22, 1908, Chap. 149, 35 Stat., 65.)

**MASTER AND SERVANT:** Assumption of Risk—Federal Employers' Liability Act. The plea of assumption of risk under the Federal Employers' Liability Act is affirmative in character and the servant is not required to negative it in order to make a prima-facie case.

*Appeal from Buchanan District Court.*—GEORGE W. DUNHAM; Judge.

SATURDAY, JANUARY 15, 1916.

ACTION at law for damages on account of the death of plaintiff's intestate. There was a directed verdict and judgment for defendant, and plaintiff appeals.—*Reversed* and *Remanded.*

*V. L. Belt, Tourtellot & Donnelly* and *Dutcher & Davis,* for appellant.

*Helsell & Helsell, Hasner & Hasner,* for appellee.

WEAVER, J.—Caleb Kenyon was a locomotive fireman in the service of the defendant company, and, at the time in question, he was employed upon an engine in use for the transportation of interstate commerce over defendant's line of road. While so engaged upon a train moving north from the city of Waterloo, the engine was stopped by the side of a water pipe or penstock at the town of

Nashua for the purpose of taking water. The operation of watering the engine was effected by the use of an extension or arm at the top of a standpipe, through which the water was discharged into the tank of the engine. The arm or extension referred to was so constructed as to swing aside when not in use and hang parallel with the track, out of the way of moving trains. When, however, it was desired to take water, the engine having first been placed in position, the fireman was expected to reach out, take hold of the arm of the penstock and swing or pull it around where the discharge therefrom would fall into the manhole of the tank. To do this, it was necessary for the fireman to take his stand on the top of the tank. On the occasion in question, Kenyon was seen to climb to the top of the tank and to be engaged in watering his engine. This having apparently been accomplished, he appeared to attempt to swing the penstock away from its position over the tank. He first pushed with one hand, but for some reason was not able to move it effectively; then he placed both hands on the pipe, using considerable force to start it, when it suddenly gave way "with a jerk", precipitating him headfirst to the ground or platform below and resulting in his fatal injury. This action for the recovery of damages is brought by the administrator of the estate of deceased, alleging that his injury and death were occasioned by the negligence of the defendant in the following respects:   (1) That in the exercise of reasonable care for the safety of its employes in such service, defendant should have equipped its penstock with rods, chains or ropes so adjusted that the fireman could reach and handle it without being compelled to endanger himself by reaching or leaning far over the side of the tank for that purpose, and that no such protection or appliance was in fact provided; (2) that reasonable care required the defendant to have its penstock so constructed and equipped and in such state of repair that, when the tank was filled, the penstock could be swung back into place with reasonable effort and without catching or holding, and that its movements should have been

secured or protected by a lock or notch or clutch or other similar device which would stop and hold it in place when it reached its proper position parallel with the track, and that none of such safeguards was in fact provided; (3) that the penstock, as constructed and maintained, would not swing with reasonable ease, as was the case with penstocks properly constructed and properly maintained, and was so placed as to make it necessary for deceased to stand upon the extreme edge of the tank and push with great force, and that in the performance of such duty the penstock stuck or bound and failed to move until deceased applied greater force, when it suddenly moved, causing him to lose his balance and fall and receive the injuries complained of, all of which injuries it is again alleged were caused by defendant's lack of care in providing and maintaining a reasonably safe equipment for watering its engines at the time and place stated. The defendant, by its answer, admits that the train in question was employed in interstate commerce and that deceased was also employed in such service. It alleges that the fall and death of the fireman were purely accidental, and occurred without fault or negligence on its part, and by way of defense, and in mitigation of damages, it also pleads that deceased occasioned or contributed to his injury by his own want of reasonable care. It is further alleged that the penstock was built and equipped in accordance with the best approved methods in use by railroads; that deceased knew the facts with reference to its structure and use, and assumed the risk thereof.

In addition to that which has already been mentioned, there was evidence tending to show that deceased had been in defendant's employment as a fireman for a considerable period, but had been sick and in a hospital from November, 1909, to March, 1910. He returned to his work in June, 1910, and was employed on another division of the road until about 8 days before his injury in November, 1910, when he began making trips over the northern route through Nashua, and had

made four or five trips when the accident occurred. There was evidence from which the jury could find that the penstock was so constructed and adjusted that, when in proper order or in good working condition, it could, with comparative ease, be swung into position for filling a tank, and when this had been accomplished, its replacement by swinging it back parallel with the track did not require the application of any great force. It appears that the mechanism by which the penstock was operated was so adjusted that, when in position over the tank and ready to swing back to its resting place, it stood at the "high point" and its movement back was aided by gravity until it reached the parallel position, where an automatic lock or "low point" in the segment upon which it moved held it in place and prevented its being blown or moved back over the track. An expert witness, describing its operation, says that, with the penstock in proper condition, "with a very slight pressure in passing over the center it would go back of its own weight, its own accord, its springs would have a tendency to roll down hill and pull it back into normal position." An eyewitness of the accident testifies that the fireman "pushed first like it did not work very good; it went hard"; that he first pushed with one hand, but it did not move, and then he applied both hands, "and it pushed real hard and when he pushed with both hands it jerked and gave way. The penstock moved hard when he pushed as I have described. It gave way with a jerk as I have described and he fell off." Another bystander corroborates the statements of the witness quoted. A locomotive engineer, who had also served as fireman on this division, testified that he knew the condition of the penstock at the time that Kenyon was killed, and says that for a considerable period, when it was swung back to a point about over the edge of the tank, it would stick, but when pushed past this point, the movement was easier. He further swears that he had twice reported the trouble with the penstock to the station agent and to the section foreman, but that no change had been made in its condition up to the

time that Kenyon was killed. Another witness, a mail agent on this route, testifies that for two or three months before Kenyon's death, he had, on different occasions, been on the platform at Nashua and had noticed firemen having difficulty in operating the penstock, and had himself stopped and rendered assistance in moving it into place, using for that purpose a lever fastened near the bottom of the penstock, and that "it took a good strong pull" to bring it around. Other evidence was given and other offers made; but as our view of the effect of that to which we have referred is sufficient for the disposal of the appeal, we do not undertake its more particular mention.

At the close of the plaintiff's testimony, the defendant's motion for a directed verdict in its favor was sustained. Which of the numerous grounds of the motion the court held to be well assigned, we are not informed by the record; but we think it safe to assume from the course of counsel's arguments that the controlling proposition was that plaintiff had produced no evidence upon which the jury could properly find defendant chargeable with negligence.

We are of the opinion, however, that the evidence, if believed by the jury, was sufficient to sustain a finding that the penstock was in a defective condition, that defendant had notice of such defective condition in ample time to have remedied it before the accident, and that its failure to remedy the defect was the proximate cause of the death of plaintiff's intestate; in other words, we hold that the plaintiff, upon the record as made, was entitled to go to the jury.

As this conclusion necessitates a new trial, it is better that we enter upon no discussion of the merits of the case, except to add that this is an action under the Federal statute, and

2. NEGLIGENCE: contributory negligence: Federal Employers' Liability Act.

the contributory negligence, if any, of the deceased will not necessarily defeat a recovery by plaintiff, and that the plea of assumption of risk is affirmative in character, and the

**3. MASTER AND SERVANT: assumption of risk: Federal Employers' Liability Act.**

plaintiff was not required to negative it in order to make a prima-facie case.

For reasons stated, the judgment below will be reversed and cause remanded for new trial.—*Reversed* and *Remanded.*

DEEMER, GAYNOR and PRESTON, JJ., concur.